**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DANYEL GIACOMELLI, | ) | CASE NO. 1:18CV1936 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Danyel Giacomelli ("Plaintiff" or "Giacomelli"), challenges the final decision
of Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),
denying her applications for a Period of Disability ("POD") and Disability Insurance Benefits
("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.*
("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the
parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's
final decision is AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

# I. PROCEDURAL HISTORY

In November 2015, Giacomelli filed an application for POD and DIB alleging a disability onset date of December 1, 2014 and claiming she was disabled due to arthritis and carpal tunnel syndrome. (Transcript ("Tr.") at 134, 149.) The applications were denied initially and upon reconsideration, and Giacomelli requested a hearing before an administrative law judge ("ALJ"). (Tr. 75, 82, 89.)

On December 13, 2017, an ALJ held a hearing, during which Giacomelli, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 25.) On January 31, 2018, the ALJ issued a written decision finding Giacomelli was not disabled. (Tr. 8.) The ALJ's decision became final on July 23, 2018, when the Appeals Council declined further review. (Tr. 1.)

On August 23, 2018, Giacomelli filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 15.) Giacomelli asserts the following assignment of error:

> (1)    Whether substantial evidence supports the ALJ's finding that Ms. Giacomelli can perform frequent handling, fingering and feeling.

(Doc. No. 13.)

# II. EVIDENCE

## A. Personal and Vocational Evidence

Giacomelli was born in August 1970 and was forty seven years-old at the time of her administrative hearing, making her a "younger" person under social security regulations. (Tr. 19.) *See* 20 C.F.R. §§ 404.1563. She has a high school education and is able to communicate in English. (*Id.*) She has past relevant work as a data entry clerk. (Tr. 18.)

**B.**     **Relevant Medical Evidence**[2]

On June 19, 2013, Giacomelli visited orthopedist Alan L. Panteck, M.D. for a right foot injury. (Tr. 203.) She reported injuring her foot eight months prior on a set of stairs. (*Id.*) Giacomelli denied any treatment for this injury but indicated she was waking up at night with pain. (*Id.*) On examination, she displayed no obvious swelling, but had tenderness and a minimally antalgic gait. (*Id.*) X-rays of the right foot revealed a possible old fracture at the base of the third metatarsal. (*Id.*) Dr. Panteck ordered an MRI to evaluate Giacomelli for a Lisfranc sprain. (*Id.*) A June 25, 2013 right foot MRI indicated Lisfranc joint arthrosis, but no discrete stress fracture or definite sprain. (Tr. 209.)

Giacomelli returned to Dr. Panteck on January 19, 2016, reporting a three-month history of right upper extremity pain. (Tr. 204.) She described pain along the medial aspect of the right elbow and right thumb. (*Id.*) Giacomelli denied treating this pain with anti-inflammatory medication, but indicated she modified her activities without much relief. (*Id.*) On examination, she had a full range of motion in her right elbow, wrist, and fingers. (*Id.*) She was "exquisitely tender over the medial epicondyle," but had no tenderness over the lateral epicondyle or radial tunnel. (*Id.*) Giacomelli displayed significant pain with resisted wrist and finger flexion and tenderness at her first CMC joint. (*Id.*) However, x-rays of her right thumb revealed essentially no arthritic changes at her first CMC joint or any evidence of STT arthritis. (*Id.*) Dr. Panteck diagnosed Giacomelli with right medial epicondylitis and administered a Kenolog and Lidocaine injection on the right side. (*Id.*)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

On January 20, 2016, Giacomelli visited primary care physician Jason Sustersic, D.O., for bilateral hand eczema and ear pain. (Tr. 213.) Dr. Sustersic observed redness in both ears and diagnosed bilateral ear infections. (Tr. 214.) He prescribed a course of antibiotics for this issue. (*Id*.) Dr. Susteric also prescribed steroids for the severely dry skin on Giacomelli's hands. (*Id*.)

On February 16, 2016, Giacomelli visited neurologist Augusto C. Juguilon, M.D., for neck, shoulder, hand, and wrist pain. (Tr. 226.) She described "generalized aches and pains" on a constant and daily basis. (*Id*.) She reported constant hand pain, despite undergoing bilateral carpal tunnel release procedures over a decade prior. (*Id*.) On examination, Giacomelli was tender in her cervical spine and shoulders, with minimal discomfort to palpation in the lumbar region. (*Id*.) Her motor strength was good in both her upper and lower extremities and she displayed no tremor. (*Id*.) She had decreased pinprick sensation in both hands. (*Id*.) An EMG/nerve conduction study of her arms and neck revealed (1) bilateral mild recurrent carpal tunnel syndrome; (2) bilateral mild ulnar compression neuropathy at the elbow; (3) bilateral multi-level cervical radiculopathy; (4) no evidence of ulnar compression neuropathy at the canal of the guyon; (5) no peripheral neuropathy; and (6) no myopathy. (Tr. 221.)

Giacomelli returned to Dr. Juguilon on April 19, 2016. (Tr. 225.) Dr. Juguilon reviewed Giacomelli's recent labwork, which revealed an elevated sedimentation rate of 30, satisfactory C-reactive protein levels, severe anemia, and low B12 levels. (*Id*.) Her CCP antibodies were highly elevated and the remainder of the testing was negative. (*Id*.) Dr. Juguilon noted Giacomelli "claims that she is unable to do any daytime job because [she] is constantly fatigued

plus having generalized aches and pains." (*Id*.)  He referred her to rheumatology for a connective tissue disease and hematology for anemia and B12 deficiency.  (*Id*.)

An April 25, 2016 cervical MRI revealed the following: (1) degeneration of the left paramedian protrusion of the C5-6 disc causing mild flattening of the left side of the spinal cord; (2) a diminished T1 signal in the marrow, possibly due to marrow replacement disease; and (3) prominent adenoidal tissue, which was unusual for Giacomelli's age.  (Tr. 242.)

Giacomelli saw Dr. Sustersic on May 24, 2016, for left shoulder, hip, and groin pain. (Tr. 310.)  She indicated her left shoulder pain began after dropping a bag of groceries two weeks prior.  (*Id*.)  Dr. Sustersic noted Giacomelli needed to start B12 shots due to her recent labwork results.  (*Id*.)  On examination, Giacomelli had tenderness in her left AC joint, with a normal range of motion and muscle strength.  (Tr. 311.)  Dr. Sustersic prescribed a course of steroids for her symptoms.  (Tr. 312.)

On October 25, 2016, Giacomelli visited Dr. Panteck for left hip pain.  (Tr. 292.)  She described this pain as radiating distally, but not going into her knee.  (*Id*.)  She denied any numbness or back pain.  (*Id*.)  On examination, Giacomelli tended to "lurch towards her left side" and was tender along her left greater trochanter.  (*Id.*)  She had no tenderness along her IT band. (*Id*.)  Giacomelli voiced no complaints of groin pain with hip range of motion testing or heel tap.  (*Id*.)  X-rays of her left hip confirmed no arthritic changes, acute dislocation, or fracture.  (*Id*.)  Dr. Panteck concluded Giacomelli's hip pain was likely due to greater trochanteric bursitis and administered a Kenalog and Lidocaine injection.  (*Id*.)

Giacomelli visited Dr. Sustersic several days later, on October 28, 2016.  (Tr. 307.)  She described myalgias and pain in her back and neck.  (*Id*.)  On examination, she had tenderness

and skin sensitivity in multiple joints, but her range of motion and strength testing was normal. (Tr. 308.)  Dr. Sustersic diagnosed fibromyalgia, recommended regular exercise, and prescribed Cymbalta.  (Tr. 309.)

Giacomelli followed up with Dr. Sustersic on December 23, 2016.  (Tr. 304.)  She felt "much better" on Cymbalta and her chronic pain levels had dropped from an 8/10 to a 4/10.  (*Id.*) She reported continued bilateral hip and lower back pain, but it was improved.  (*Id.*)  She requested an increased dosage of Cymbalta, which Dr. Sustersic provided.  (Tr. 304, 306.)  On examination, she had no joint swelling and a normal range of motion and movement in her extremities.  (Tr. 305.)

On May 9, 2017, Giacomelli visited Dr. Panteck for bilateral hand and elbow pain, the right side worse than the left.  (Tr. 316.)  On examination, her right arm was tender to palpation over the lateral epicondyle and she had significant pain with resisted wrist and finger extension. (*Id.*)  There was no tenderness over the medial epicondyle.  (*Id.*)  On the left side, Giacomelli again had tenderness over the lateral epicondyle, but not to the same degree as the right side. (*Id.*)  She had mild pain with resisted wrist and finger extension.  (*Id.*)  Dr. Panteck administered Kenalog and Lidocaine injections in Giacomelli's lateral epicondyles.  (*Id.*)

Giacomelli continued to report bilateral wrist and elbow pain on May 18, 2017.  (Tr. 336.)  She indicated the recent injections provided minimal relief.  (*Id.*)  On examination, Giacomelli had no joint swelling, a normal range of motion, and normal movements in all of her extremities.  (Tr. 337.)  Dr. Sustersic advised her to wear wrist braces at bedtime and ice her hands for 20-30 minutes, 2-3 times a day.  (Tr. 338.)  Giacomelli returned to Dr. Sustersic for

right elbow pain on July 21, 2017.  (Tr. 333.)  On examination, her lateral epicondyle was tender.  (Tr. 335.)  Dr. Sustersic prescribed a course of steroids.  (*Id.*)

## C.      State Agency Reports

On April 30, 2016, Giacomelli underwent a consultative examination with physician Kyle E. Walker, M.D.  (Tr. 259-266.)  She reported arm and hip pain.  (Tr. 259.)  She indicated her bilateral carpal tunnel release procedures only alleviated her hand pain for about 2-3 years. (*Id.*)  On examination, Giacomelli had 4/5 strength in her left shoulder and 3/5 strength in her left hip flexor.  (Tr. 260.)  Otherwise, she had full strength in her upper and lower extremities. (*Id.*)  She reported numbness and paresthesia in her 1st, 2nd, 4th, and 5th digits, but her light touch sensation was otherwise intact in her arms and legs.  (*Id.*)  Her gait favored the left side.  (*Id.*)

X-rays of the left hip indicated "mild joint space narrowing but no other signs of chronic inflammation or degeneration."  (Tr. 261.)  Her right shoulder x-ray was normal.  (*Id.*)  Her grasp was slightly weak bilaterally, but she had normal manipulation, pinch, and fine motor coordination.  (Tr. 263.)  Her cervical spine, shoulder, elbow, hand, and finger ranges of motion were all normal.  (Tr. 264-265.)  Her hip, knee, and ankle ranges of motion were also normal. (Tr. 266.)

Based upon this examination, Dr. Walker provided the following statement:

Ms. Giacomelli's history and physical, except for the 1st and second digit parethesias, is typical for ulnar neuropathy that can be the result of [carpal tunnel syndrome] or cubital tunnel syndrome.  The numbness/parenthesis of the 1st and 2nd digits might be attributed to polyneuropathy.  An EMG could better support this.  Despite this minor inconsistency, I believe Ms. Giacomelli's exam to be reliable and would expect she would have mild to moderate limitations with lifting and carrying.  This is especially true when performing these activities with heavier objects or for long periods of time. She may also have mild limitations with handling objects.

> The claimant does not have any limitations with sitting, standing, walking, hearing, speaking, traveling or with memory.

(Tr. 261.)

On May 12, 2016, state agency physician Stephen Sutherland, M.D., reviewed Giacomelli's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 68-70.) Dr. Sutherland determined Giacomelli could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday. (Tr. 68-69.) He further found Giacomelli was limited to occasional climbing of ramps and stairs, never climbing ladders, ropes, or scaffolds, frequent stooping, kneeling, and crouching, and could occasionally crawl. (Tr. 69.) Dr. Sutherland opined Giacomelli was limited to frequent handling, fingering, and feeling with the bilateral upper extremities. (Tr. 70.) He concluded Giacomelli would need to avoid concentrated exposure to extreme cold, vibration, and hazards and could not work at unprotected heights or perform commercial driving. (*Id.*)

On August 26, 2016, state agency physician Dimitri Teague, M.D., reviewed Giacomelli's medical records and completed a Physical RFC Assessment. (Tr. 56-58.) He adopted Dr. Sutherland's findings. (*Id.*)

**D.     Hearing Testimony**

During the December 13, 2017 hearing, Giacomelli testified to the following:

- She lives with her husband and son. (Tr. 28.) She drives 1-2 times a week, but avoids distances longer than 10-15 miles. (*Id.*) She no longer feels comfortable driving longer distances because of an incident where she could not grip the steering wheel. (Tr. 28-29.)

- She attended college for two years. (Tr. 29.) She worked at a hospital performing data entry and scheduling. (*Id.*)

- She has undergone carpal tunnel surgery on both wrists. (Tr. 32.) She returned to work after each procedure. (*Id.*) In May 2014, her hands were swelling and after work she would have to submerge them in ice water. (Tr. 33.) She had difficulty typing, picking up the phone, opening doors, and using a pen, so she eventually stopped working in May 2014. (*Id.*)

- She also has problems using her hands at home. (Tr. 33-34.) She struggles to open doors, fold clothes, and wash her hair. (Tr. 34.) She has trouble gripping and grasping, dropping objects multiple times each day. (*Id.*)

- She has a burning sensation in her hands. (Tr. 34.) She wears splints on her hands at night but still wakes up in pain. (Tr. 34-35.) She cannot lift a gallon of milk. (Tr. 36.) She can lift a stack of folded towels. (*Id.*)

- She has burned and cut her hands cooking. (Tr. 37.) She refuses to take narcotics for her hand pain, but she does take nerve pain medications. (Tr. 38.) She finds these medications helpful, but they make her tired and confused. (*Id.*) Her doctors have offered her no other treatment options for her hands. (Tr. 39.)

- She has hip bursitis. (Tr. 39.) She underwent a cortisone injection, which she found helpful. (*Id.*)

- She has trouble dressing and fixing her hair. (Tr. 40-41.) She does not buy anything that has a twist cap. (Tr. 41.) She hangs all her clothing because she cannot fold it. (*Id.*) All of her shoes slip on and she has trouble putting socks on. (*Id.*) She finds it "very difficult" to use buttons and zippers. (Tr. 42.)

The VE testified Giacomelli had past work as a data entry clerk (D.O.T. #203.582-054).

(Tr. 44.) The ALJ then posed the following hypothetical question:

Please assume a hypothetical individual of the Claimant's age, education, and work experience who's able to perform light exertional work activities as defined in the regulations with the following limitations. The individual can frequently handle, finger, and feel bilaterally; frequently stoop, kneel, crouch; occasionally climb ramps and stairs and crawl; never climb ladders, ropes, and scaffolds; should never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle. The individual should avoid concentrated exposure to extreme cold and vibrations as well.

(Tr. 44-45.)

The VE testified the hypothetical individual would be able to perform Giacomelli's past work. (Tr. 45.) The VE further explained the hypothetical individual would also be able to perform other representative jobs in the economy, such as a sales attendant (D.O.T. #299.677-010); food service worker (D.O.T. #311.677-010); and housekeeper (D.O.T. #323.687-014). (*Id*.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work

activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Giacomelli was insured on her alleged disability onset date, May 21, 2014 and remains insured through December 31, 2019, her date last insured ("DLI.") (Tr. 13.) Therefore, in order to be entitled to POD and DIB, Giacomelli must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2. The claimant has not engaged in substantial gainful activity since May 21, 2014, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairments: bilateral carpal tunnel, status post carpel tunnel release; ulnar neuropathy; cervical radiculopathy;

11

cervical degenerative disc disease; cervical spondylosis; connective tissue disease; and impingement syndrome of the left shoulder (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except frequently handle, finger and feel bilaterally; frequently reach in all directions; frequently stoop, kneel and crouch; occasionally climb ramps or stairs and crawl; never climb ladders, ropes, or scaffolds; should never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle; and should avoid concentrated exposure to extreme cold or vibration.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on August **, 1970 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from May 21, 2014, through the date of the decision (20 CFR 404.1520(g)).

(Tr. 13-20.)

# V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice"

within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

# VI. ANALYSIS

### A.    RFC

Giacomelli argues the "ALJ's assessment of [her] residual functional capacity, and her ability to perform substantial gainful activity, is not supported by substantial evidence." (Doc. No. 13 at 9.) She asserts the "evidence from [her] treating sources supports" her upper extremity symptoms. (*Id*. at 10.) Giacomelli contends the "evidence proves [she] suffers from pain, stiffness, weakness, and numbness which restrict [her] use of her upper extremities to such a degree that . . . frequent use of [her] hands and arms are prohibited." (*Id*. at 12.)

The Commissioner maintains the ALJ's RFC assessment, in particular the manipulative limitations, are supported by substantial evidence. (Doc. No. 15 at 11.) The Commissioner asserts Giacomelli "has not presented medical or other evidence demonstrating that her impairments caused manipulative limitations beyond those the ALJ incorporated into the RFC." (*Id*. at 10.)

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 416.945(a). A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner. *See* 20 C.F.R.§ 416.927(d)(2).[3] An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." *See* 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for

---

[3]    Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and must consider all of a claimant's medically determinable impairments, both individually and in combination, S.S.R. 96-8p.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.Appx. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, at *7, 1996 SSR LEXIS 5, *20 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")). While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, the ALJ determined Giacomelli had the following residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except **frequently handle, finger and feel bilaterally; frequently reach in all directions**; frequently stoop, kneel and crouch; occasionally climb ramps or stairs and crawl; never climb ladders, ropes, or scaffolds; should never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle; and should avoid concentrated exposure to extreme cold or vibration.

(Tr. 16.)(emphasis added).

The Court finds the upper extremity limitations contained within the RFC are supported by substantial evidence. Giacomelli has a long-standing history of carpal tunnel syndrome and underwent bilateral carpal tunnel release procedures over a decade ago. (Tr. 226.) She testified she discontinued working in May 2014 because her carpal tunnel symptoms had returned. (Tr. 33.) However, in January 2016, Giacomelli had a full range of motion in her right elbow, wrist, and fingers. (Tr. 204.) X-rays were negative for any arthritic changes in her right thumb. (*Id*.) Her February 2016 EMG and nerve conduction study indicated her carpal tunnel and ulnar compression neuropathy were mild in nature. (Tr. 221.) There was no evidence of peripheral neuropathy. (*Id*.) The EMG did reveal cervical radiculopathy and a cervical MRI confirmed mild flattening to the left side of her spinal cord. (Tr. 221, 242.)

Further, at her April 2016 consultative examination, Giacomelli had normal manipulation, pinch, and fine motor coordination in her hands. (Tr. 263.) Her cervical spine, shoulder, elbow, hand, and finger ranges of motion were all normal. (Tr. 264-265.) The consultative examiner concluded Giacomelli would have "mild to moderate limitations with lifting and carrying" and "mild limitations with handling objects." (Tr. 261.) While Giacomelli continued to report elbow and hand pain for the remainder of the relevant period, she often had no joint swelling and a normal range of motion in her extremities. (Tr. 316, 336, 305, 337.)

In the decision, the ALJ considered and discussed Giacomelli's carpal tunnel, ulnar compression neuropathy, and cervical radiculopathy. (Tr. 17.) She specifically noted the EMG and nerve conduction study results. (*Id*.) She discussed the objective findings made during Giacomelli's consultative examination, including decreased grip and sensation, but good motor strength. (*Id*.) The ALJ acknowledged these findings supported a "limitation to light work with

only frequent handling, fingering and feeling" and incorporated the manipulative limitations provided by the reviewing state agency physicians into the RFC. (Tr. 16-18.) The ALJ's interpretation of the evidence was a reasonable one and does not provide grounds for reversal.

Giacomelli attempts to argue the RFC is not supported the evidence because the state agency physicians reached their conclusions with a record "devoid of [her] EMG and cervical MRI." (Doc. No. 13 at 11.) However, an examination of the reviewing state agency opinions indicates the EMG was received into the record on March 2, 2016 and Dr. Sutherland specifically discussed it at the initial level of review. (Tr. 66.) As for Giacomelli's cervical MRI, it is true that it was not contained in the record until after the reviewing state agency physicians issued their opinions. (Tr. 53, 224, 242.) Nevertheless, it is not an error for an ALJ to rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating her opinion. *See, e.g., McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions). Here, the ALJ provided a detailed discussion of the April 2016 cervical MRI, demonstrating she considered the evidence following the state agency determinations. (Tr. 18.)

Giacomelli next argues the ALJ "erroneously interpreted raw medical data to reach her determination that [she] could use her hands frequently." (Doc. No. 13 at 13.) The crux of Giacomelli's argument is because the state agency physicians did not have the EMG, nerve conduction study, or cervical spine MRI for their review when they reached their conclusions, the ALJ erroneously interpreted these test results when formulating the RFC. (*Id*.) As discussed

*supra*, despite Giacomelli's assertion otherwise, the reviewing state agency physicians did

consider the EMG and nerve conduction studies when reaching their conclusions. (Tr. 66.)

After reviewing this testing, the state agency physicians limited Giacomelli to frequent handing,

fingering, and feeling. (Tr. 70.) The ALJ, in turn, assessed these same manipulative limitations

in the RFC. (Tr. 16.) Thus, the ALJ could not have "interpreted raw medical data" because her

limitations were consistent with physicians' opinions[4] who had the opportunity to interpret these

test results.

The Court similarly finds the ALJ did not "interpret raw medical data" when

considering Giacomelli's cervical MRI. While the state agency physicians may not have had

this cervical MRI for their review, it had already been read and interpreted by a radiologist, D.H.

Berns, M.D. (Tr. 242-243.) *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 726–27 (6th

Cir. Sept. 5, 2012) (ALJ did not impermissibly act as a medical expert in interpreting medical

evidence, and did not interpret raw medical data beyond her ability where X-rays had already

been read and interpreted by a radiologist). The radiologist's report, indicating "mild" and

"moderate" findings, is consistent with the opinions which are contained in the record and the

resulting RFC. *See Bowen v. Comm'r of Soc. Sec.*, 2019 WL 1986524, *6 (S.D. Ohio May 6,

2019). Moreover, this MRI report did not require the ALJ "to interpret raw data beyond [her]

---

[4]    Giacomelli emphasizes the fact the consultative examiner, Dr. Walker, had
apparently not had the opportunity to review the EMG/nerve conduction study
prior to reaching his conclusion. (Doc. No. 13 at 12, Tr. 261.) Regardless, the
reviewing state agency physicians did have these diagnostic tests for their review.
(Tr. 66.) Giacomelli does not direct this Court's attention to any regulation or
case law which requires all state agency doctors to have access to all medical
records in order to reach a conclusion. Indeed, such a requirement would be
impossible, as an individual's medical record would presumably continue to grow
up until the date of the ALJ administrative hearing and decision.

ability in order to determine consistency." *Austin v. Comm'r of Soc. Sec.*, 2014 WL 897139, *6 (S.D. Ohio Mar. 6, 2014).

Giacomelli suggests remand is required in order to obtain an opinion from a physician who can review all of this evidence. (Doc. No. 13 at 13.) However, the ALJ "was not required to obtain a medical expert to interpret the medical evidence related to [Giacomelli's] physical impairments." *Rudd*, 531 Fed. App'x at 726. Indeed, it is the ALJ, not a physician, who is tasked with the responsibility of formulating an RFC. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir.2004) ("the ALJ is charged with the responsibility of evaluating the medical evidence").

In sum, the Court finds the RFC is supported by substantial evidence and the ALJ did not impermissibly act as a medical expert when evaluating the diagnostic testing and formulating the RFC. Accordingly, this argument is without merit and does not provide a basis for remand.

**B.      Credibility**

Giacomelli also argues the "ALJ's credibility determination is not supported by substantial evidence." (Doc. No. 13 at 14.) Giacomelli argues while the ALJ recognized her testimony regarding her difficulty using her hands, the ALJ "failed to provide sufficiently specific reasons for rejecting" this testimony. (*Id.* at 14-15.)

The Commissioner asserts the "ALJ provided a reasonable evidentiary basis for her assessment of [Giacomelli's] subjective reports, and, in turn, her assessment of [Giacomelli's] manipulative limitations." (Doc. No. 15 at 6.) The Commissioner maintains the ALJ "considered multiple factors in assessing [Giacomelli's] subjective allegations," including the objective medical evidence, the diagnostic testing, the opinion evidence, the treatment course,

and Giacomelli's activities of daily living.  (*Id*. at 6-8.)  The Commissioner contends

Giacomelli's "challenge is nothing more than disagreement with the ALJ's consideration of

these factors."  (*Id*. at 8.)

It is well settled that pain alone, if caused by a medical impairment, may be severe

enough to constitute a disability.  *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524,

538 (6th Cir. 1981), cert. denied, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983).

However, when a claimant alleges symptoms of disabling severity, the ALJ must follow a

two-step process for evaluating these symptoms.  *See e.g, Massey v. Comm'r of Soc. Sec.*, 2011

WL 383254 at * 3 (6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an

underlying medically determinable physical or mental impairment that could reasonably be

expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and

persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms

limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[5]

2016 WL 1119029 (March 16, 2016).  Essentially, the same test applies where the alleged

symptom is pain, as the Commissioner must (1) examine whether the objective medical evidence

supports a finding of an underlying medical condition; and, if so, (2) whether the objective

medical evidence confirms the alleged severity of pain arising from the condition or whether the

objectively established medical condition is of such a severity that it can reasonably be expected

to produce the alleged disabling pain.  *Duncan v. Secretary of Health & Human Services*, 801

---

[5]      SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28,
2016.  Thus, SSR 16-3 was in effect at the time of the December 13, 2017
hearing.

F.2d 847, 853 (6th Cir. 1986).  *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir.

1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. App'x 828, 834 (6th Cir. June 2005).

If these claims are not substantiated by the medical record, the ALJ must make a

credibility[6] determination of the individual's statements based on the entire case record.

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  *See*

*Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r*

*of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations

regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled

to considerable deference and should not be discarded lightly.  *See Villareal v. Sec'y of Health &*

*Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must

contain specific reasons for the weight given to the individual's symptoms ... and be clearly

articulated so the individual and any subsequent reviewer can assess how the adjudicator

evaluated the individual's symptoms"  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d

at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason

for doing so").

---

[6]     SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029 at *6.  The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. App'x 113, 119 n.1 (6th Cir. 2016).  Neither party has argued the analysis is different under SSR16-3p, though Ingram has incorrectly asserted SSR 16-3p was issued following the June 28, 2016 ALJ decision.  (Doc. No. 13 at 9.)

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §404.1529; SSR 16-3p, Purpose, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[7] The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Giacomelli's testimony and written statements regarding her difficulty using her hands and fingers. (Tr. 16-17.) She noted Giacomelli reported "constant pain in her hands and elbows," difficulty performing manipulative tasks, a tendency to "drop[] things multiple times a day," and reduced grip strength and sensation. (*Id.*) The ALJ provided a discussion of Giacomelli's treatment notes, the diagnostic testing, the objective findings upon examination, and the medical opinion evidence. (Tr. 17-18.) The ALJ determined Giacomelli's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 17.) However, the ALJ found her statements concerning the intensity,

---

[7]    The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record.  (*Id*.)

The ALJ also provided the following comparison of Giacomelli's subjective allegations to the medical evidence:

> As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent.  In February 2016, claimant underwent a conduction study which showed bilateral mild carpal tunnel syndrome, bilateral mild ulnar compression neuropathy at the elbow, and bilateral multi-level cervical radiculopathy (7F/2).  At her April 2016 consultative examination, claimant had 4/5 strength in her left shoulder, 3+/5 in the left hip flexor, 4+/5 in bilateral grip, and otherwise she had 5/5 strength in her bilateral upper and lower extremities, and a negative bilateral straight raise leg raise test (11F/3).  Claimant reported numbness/paresthesias in the bilateral 4th and 5th digits as well as in the 1st and 2nd digit, but the latter was not as severe.  Her light touch sensation was intact in the bilateral upper and lower extremities, though she had decreased sensation in both hands (8F/3).  That decreased sensation supports the limitation to light work with only frequent handling, fingering and feeling, never climbing ladders, never being around hazards and the environmental limitations.

(Tr. 17.)

The Court finds substantial evidence supports the ALJ's assessment of Giacomelli's subjective complaints.  While Giacomelli testified to incredibly limited manipulative abilities, the objective evidence, as noted by the ALJ, is not entirely consistent with these allegations.  In January 2016, she had a full range of motion in her hands, wrists, and fingers.  (Tr. 204.)  X-rays of her thumb were negative for any arthritic changes.  (*Id*.)  In February 2016, while she had decreased sensation in both hands, she had good motor strength in her upper extremities.  (Tr. 226.)  An EMG indicated her carpal tunnel syndrome and ulnar compression neuropathy were both mild in nature.  (Tr. 221.)  In May 2017, she described continued wrist and elbow pain, but displayed no joint swelling, a normal range of motion, and normal movements in all extremities.

(Tr. 336-337.)  Moreover, during her April 2016 consultative examination, she had normal manipulation, pinch, and fine motor coordination.  (Tr. 263.)

Giacomelli argues the ALJ "failed to provide sufficiency specific reasons" for rejecting her hand impairment allegations.  (Doc. No. 13 at 15.)  The Court disagrees.  Indeed, the ALJ referenced Giacomelli's allegations and then contrasted them with the medical evidence, including diagnostic testing and objective examination findings, as well as the opinion evidence. (Tr. 17-18.)  Reading the decision as a whole, it is clear why the ALJ did not accept the entirety of Giacomelli's allegations.  *See* SSR 16-3p, 2016 WL 1119029 (the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").

In sum, the ALJ considered a number of factors in assessing Giacomelli's credibility, including her treatment course, the objective findings upon examination, and the opinions contained in the record.  These factors are supported by the evidence in the record and are sufficiently specific to make the basis of the ALJ's credibility analysis clear.  Accordingly, this argument is without merit and does not provide a basis for remand.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

_s/Jonathan D. Greenberg_
Jonathan D. Greenberg
United States Magistrate Judge

Date: June 14, 2019